Robert E. DOUGLAS, Petitioner,

v.

Roy L. HENDRICKS, Superintendent, and John Farmer, Attorney General of New Jersey, Respondents.

Civ. No. 99–5642(WHW).

United States District Court, D. New Jersey.

Aug. 26, 2002.

414

Robert E. Douglas, Trenton, NJ, Pro Se Petitioner.

Raymond Hoffman, Newark, NJ, for Respondents Roy L. Hendricks and The Attorney General of the State of New Jersey, John J. Farmer.

## OPINION

WALLS, District Judge.

Petitioner Robert E. Douglas ("Petitioner" or "Defendant") petitions *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The grounds for the Petition can be divided into the following categories: (1) denial of speedy trial rights; (2) erroneous reinstatement of indictment; (3) unconstitutional search and seizure; (4) unconstitutional arrest warrant; (5) inadequate representation, including denial of counsel, constructive denial of counsel and ineffective assistance of counsel; (6) denial of a fair trial, including prosecutorial misconduct, erroneous admission of evidence, erroneous jury instructions, failure to declare mistrial and verdict against the weight of the evidence; (7) denial of a

direct appeal; (8) erroneous opinion by the Appellate Division; (9) denial of a speedy appeal and (10) deprivation of liberty. Respondent, State of New Jersey opposes the Petition. The Petition is denied on all grounds for the reasons stated herein.

## PROCEDURAL BACKGROUND

On October 14, 1987, Defendant was charged in Essex County Indictment No. 3400–10–87, with two counts of murder, N.J.S.A. 2C:11–3a(1) and (2) (Counts One and Two); aggravated assault, N.J.S.A. 2C:12–1b(1) (Count Three); possession of a handgun without a permit, N.J.S.A 2C:39–5b (Count Four); and possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39–4a (Count Five). He was convicted by a jury on all counts in a verdict returned on November 16, 1990. The jury elected not to impose the death penalty and on December 13, 1990, Defendant was sentenced to concurrent terms of life imprisonment with thirty years parole ineligibility on Counts One and Two and concurrent terms on the remaining counts. The trial court denied Petitioner's motion for a new trial.

The Superior Court, Appellate Division affirmed Defendant's conviction on June 23, 1995, and in doing so declined to consider several of Petitioner's constitutional claims because of the "undeveloped and incomplete" nature of the record and directed petitioner to seek post-conviction relief on those grounds. The New Jersey Supreme Court denied a petition for Certification on October 11, 1995. Petitioner filed a petition for habeas corpus relief in federal district court, which was dismissed on December 20, 1996 because Petitioner had not exhausted State remedies. On December 2, 1997, Petitioner filed a petition for post-conviction relief in Superior Court, Law Division, Essex County. On October 6, 1998 Hon. Alvin Weiss, granted Petitioner's request for post-conviction relief on the basis that he was denied his Sixth Amendment right to a speedy trial and dismissed the indictment.

The dismissal was stayed until October 22, 1998 to enable the state to file a Notice of Appeal to the Appellate Division, which was filed on October 7, 1998. On November 6, 1998, the post-conviction relief court ("PCR court") granted the state an extension of the stay until December 7, 1998. The state moved before the Appellate Division for an additional stay of the Order on November 13, 1998. Petitioner was released from prison on December 7, 1998. On December 14, 1998, the Appellate Division granted the state's motion. Petitioner was taken into custody on December 21, 1998, and released on his own recognizance until January 6, 1999. On June 17, 1999, the Appellate Division reversed the grant of post-conviction relief and reinstated his conviction, finding that Petitioner's right to a speedy trial had not been violated. On October 12, 1999, the New Jersey Supreme Court denied a petition for certification.

## FACTUAL BACKGROUND

*Factual Background Established At Trial*

The following facts were stipulated at trial: At approximately 9:30 a.m. on August 8, 1987, Deborah Neal ("Neal") called the East Orange Police to report a shooting at 7 Chestnut Street, Apartment 2E in East Orange, New Jersey. She indicated that "Skeet", the occupant of Apartment 2D, was the shooter. The dispatcher informed the responding officer, Michael Brown, that there were two victims of a shooting in Apartment 2E, that the suspect possibly lived in Apartment 2D and that he might still be in the area.

Officer Brown, accompanied by Officers Tisdale and Powell, entered 7 Chestnut

Street and found the door of Apartment 2E ajar. The officers conducted a search and found sisters Estella and Charlene Moore lying in the bedroom, each with multiple gun wounds. They did not find any other persons or weapons, however, they did recover a spent round under a radiator in the bedroom.

The officers then entered Apartment 2D, whose door was also ajar. Their visual search of the apartment did not reveal any weapons or persons. At 10:00 a.m. Captain John Armeno of the East Orange Police Department arrived and searched for weapons or "any other thing of evidentiary value" as he later admitted during trial. Captain Armeno confiscated a photograph of a man, whom he believed was the occupant of the apartment. The building manager confirmed the Captain's belief and explained that the man in the photograph was known as "Skeet". Sergeant Ronald Sepe then took the photograph to University Hospital, where the third shooting victim, Georgianna Broadway, was being treated.

When Sepe arrived at the hospital, he found Broadway lying on a stretcher in the emergency room with multiple gun wounds. She had been intubated and was having difficulty speaking. Sepe asked Broadway if she knew the person or persons responsible for the shooting. Broadway shook her head "yes" and said "Skeet". Sepe showed her the photograph of "Skeet" and asked her if that was the person responsible for the crime. Broadway nodded her head "yes" and began to cry.

Later that afternoon, an arrest warrant for Defendant's arrest and a search warrant for his apartment were executed. The application for the search warrant requested, among other things, seizure of photographs of Petitioner. At the hearings on the Motions to Suppress, Detective John Lee testified that he did not mention in the application for the search warrant that a photograph of petitioner had already been seized during an earlier search of the apartment. After obtaining the warrant police officers searched the apartment and seized various drug paraphernalia and cocaine, a Rolodex file, two black leather fighting gloves, and an empty black leather handgun holster. The officers examined the Rolodex and found Irving Gaskins' name listed.

On August 9, 1987, the day after the shootings, Sergeants Whitner and Sepe went to Gaskins' apartment in Newark, New Jersey. The officers were voluntarily admitted by a woman, who indicated that Defendant and Gaskins were in the living room. The officers informed Defendant that he was under arrest and they handcuffed him and patted him down. Defendant allegedly had a fully loaded six-shot .38 caliber revolver in his waistband and five additional .38 caliber cartridges in his right front pants pocket. Petitioner was then taken into custody.

Forensic tests proved that the fatal rounds and the bullets recovered at the crime scene had been fired from the revolver seized from the Petitioner.

Broadway testified at trial that on August 7, 1987 she visited the Moore apartment and smoked cocaine and drank alcohol with Charlene Moore until 5 a.m., when Estelle Moore returned to the apartment. At about 5:30 a.m. she and Charlene went to sleep in the bedroom. Broadway awakened some time later and heard Estella speaking to a man. Broadway testified that she questioned Charlene as to whom Estella was speaking. Broadway then recognized the voice as that of "Skeet," whom she had met for the first time the previous week. While Estella was in the bedroom with Charlene and Broadway, someone pushed open the door, fired six fast shots

and shot each of them. Although Broadway heard the shots, she did not see the shooter. When Broadway noticed that Charlene and Estella had been shot and were dead, she immediately went home and told her roommate Deborah Neal that "Skeet" had shot her. Neal contacted the ambulance and police, however she never informed the dispatcher that Broadway did not see the shooter. Before being transported to the hospital, Broadway told the Responding Officer that "Skeet" had shot her.

*Factual Background For Speedy Trial Violation*

On August 9, 1987 Petitioner was arrested and a public defender from the Office of Public Defenders ("OPD") was immediately appointed to represent him. On November 18, 1987, Petitioner entered a plea of not guilty and the State served a notice of aggravating factors on him, which indicated that his case would be tried as a capital one. On January 21, 1988, the OPD notified petitioner that it would no longer represent him because its investigation revealed that he did not qualify as indigent. The OPD based this determination on the fact that Defendant owned a home with a market value of between $70,000 and $110,000 and he was expecting recovery from a pending civil action. At the time of the public defender's withdrawal, four witnesses had been interviewed.

Through a series of errors by the court and the OPD, it was difficult for Petitioner to appeal the withdrawal of appointed counsel. Defendant nonetheless objected to the OPD's determination and following hearings on February 2 and 16, August 18 and October 12, 1988, Judge Falcone determined that Petitioner was in fact indigent and instructed the OPD to represent him.[1] Consequently, Petitioner was without representation for approximately nine months following his indictment.

Shortly after this determination, Assistant Deputy Public Defenders Albert Kapin ("Kapin") and Joseph Krakora ("Krakora") were assigned to represent Defendant. Judge Falcone set September 18, 1989 for Defendant's trial, but the trial did not commence until September 11, 1990. Defense counsel argued several pretrial motions (i.e. identification, search and seizure) between September 6 and October 17, 1989. On December 21, 1989, Kapin and Krakora sent a letter to Judge Falcone to request that he set a date to decide their pretrial motions and to set a new trial date, as their ability to prepare for trial was being hampered by their uncertainty.[2]

Because the judge did not respond to the defense attorneys' letter dated December 21, 1989, Kapin and Krakora filed a motion on February 22, 1990 to set a trial

---

1. On February 22, 1988 Judge Falcone discussed with Petitioner the possibility of appealing the OPD's eligibility determination. On April 16, 1988, Judge Falcone supplied Defendant with a copy of *State v. Nilsen,* to assist him in the appellate process. Petitioner filed a petition with the Appellate Section of the OPD. By letter dated June 20, 1988, the director of the OPD informed Defendant that on April 5, 1988, N.J.S.A. 2A:158A–15.1 became effective, authorizing the court, rather than the OPD to make indigency determinations. The Appellate Section informed Defen-

dant that it would not decide his appeal because it was deficient. Petitioner requested that the court determine his financial status and on October 12, 1988, Judge Falcone found Petitioner indigent.

2. According to Petitioner, in December 1989 and January 1990, he requested that Kapin and Krakora file a motion to object to the delay as a violation of his constitutional right to a speedy trial. Defense counsel apparently did not act upon this request.

date and to reduce defendant's bail.[3] In the affidavit in support of the motion, the attorneys alleged that the delay had prejudiced Defendant in several ways (i.e. the death of a potential defense witness, Gaskins, in September 1989 and the absence of two defense witnesses, the Tuckers, who had moved to Australia). Gaskins' testimony had not been taken and preserved by the defense attorneys.[4] The judge entered an order which set the trial date for September 10, 1990. In May 1990, the trial court issued its decisions which denied all of defendant's pretrial motions to suppress certain evidence and to preclude certain identification testimony. Jury selection commenced on September 10, 1990 and the trial began on October 30, 1990.

## DISCUSSION

### Standard for Review Under 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective April 24, 1996, amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254. For any petitions filed after the effective date of AEDPA, courts are required to apply those amended standards. *See Werts v. Vaughn,* 228 F.3d 178, 195 (3d Cir.2000) (*citing Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). Under 28 U.S.C. § 2254(a) (2001), a federal court is required to consider only petitions filed on behalf of individuals in custody pursuant to a state court judgment which are grounded on a violation of the Constitution or the laws or treaties of the United States. Moreover, the petitioner must "exhaust" all of his claims in state court before coming to federal court. *See* 28 U.S.C. § 2254(b) (2001); *Werts,* 228 F.3d at 192.

The AEDPA increased the deference federal courts must give to factual findings and legal determinations of the state courts. *See Dickerson v. Vaughn,* 90 F.3d 87, 90 (3d Cir.1996). Under the Supreme Court's landmark case, *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), federal habeas corpus relief is denied to any claim which was adjudicated on the merits in a state court proceeding, unless such application:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Id.;* 28 U.S.C. §§ 2254(d)(1) and (2)(2001). As stated by the Court of Appeals for the Third Circuit, the federal habeas court must first determine whether the state court decision was "contrary to" Supreme Court precedent. *See Keller v. Larkins,* 251 F.3d 408, 417–418 (3d Cir.2001). In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an unreasonable application of Supreme Court precedent. *Id.* The appropriate inquiry to be made

---

**3.** This motion did not seek dismissal of the indictment due to speedy trial violations.

**4.** At the time of Petitioner's arrest, Gaskins was in poor health and required the use of oxygen. Carmeta V. Albarus, a case worker, interviewed Gaskins on July 6, 1989 to obtain background information. The one-page memo states Gaskins did not see Defendant with a weapon on his person at the time of arrest. It also states that Gaskins was hooked up to an oxygen machine and had difficulty talking. No other interview was conducted with Gaskins.

under the "unreasonable application of" standard is "whether the state court's application of clearly established federal law was objectively unreasonable"; an incorrect application alone does not warrant relief. *Williams*, 529 U.S. at 409, 120 S.Ct. at 1521, 146 L.Ed.2d at 428.

The second prong requires the petitioner to show that the state court decision was based on an unreasonable determination of facts in light of the evidence presented at trial or at a hearing. *Id.* at 413, 120 S.Ct. at 1523, 146 L.Ed.2d at 430. However, factual issues determined by a state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir.2000) (*citing* 28 U.S.C. § 2254(e)(1)).

## I. *Petitioner Was Not Denied His Right To A Speedy Trial*

Petitioner asserts that he was denied his Sixth Amendment right to a speedy trial due to the delays in appointing counsel, bringing the case to trial, and filing an appeal. (Ground Three.) Petitioner contends that the three year, four month lapse of time between his arrest and sentencing violated his right to a speedy trial. The PCR court found that Petitioner was denied a speedy trial, granted post-conviction relief and dismissed the indictment. The Appellate Division reversed that decision and reinstated his conviction. *See State v. Douglas*, 322 N.J.Super. 156, 730 A.2d 451 (N.J.Super.Ct.App.Div.1999), *cert. denied*, 162 N.J. 197, 743 A.2d 849 (N.J.1999).

*Standard for Speedy Trial Violations*

■ The Supreme Court established a flexible four-part balancing test to determine whether a defendant is denied his federal constitutional right to a speedy trial. *See Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The four factors identified in *Barker* are: (1) length of delay; (2) reason for delay; (3) defendant's assertion of his right; and (4) whether defendant was prejudiced by the delay. *See Barker*, 407 U.S. at 530–32, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 116–118. The Supreme Court explained that these factors should be considered on an *ad hoc* basis and that no single factor is "either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. Rather, they [are] to be treated as related factors to be considered with such other circumstances as may be relevant." *Id.* at 533, 92 S.Ct. at 2190, 33 L.Ed.2d at 118.

■ The first factor, the length of delay, is the triggering mechanism: once the length of delay becomes presumptively prejudicial, it triggers further inquiry of the remaining factors. *See id.* at 530, 92 S.Ct. at 2192. Whether a delay is presumptively prejudicial depends on the "circumstances of the case." *Id.* The second factor, the reasons for delay, is assigned varying weight:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

*Id.* at 531, 92 S.Ct. at 2192. The third factor, defendant's assertion of his speedy trial right, gives evidentiary weight to the determination of whether that right was violated. *Id.* at 531–32, 92 S.Ct. 2182. The fourth factor, prejudice to the defendant, should be assessed in light of the following three interests: "(I) to prevent oppressive pretrial incarceration; (ii) to minimize anx-

iety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532, 92 S.Ct. at 2193. Impairment of the defense is considered the most serious factor in the analysis. *Id.* "If witnesses die or disappear during a delay, the prejudice is obvious." *Id.*

 The Third Circuit articulated the legal standard of review for speedy trial violations as follows: "The district court's legal conclusions that [Petitioner] failed to establish a violation of his constitutional rights to a speedy trial or due process are reviewable *de novo.*" *Burkett v. Fulcomer,* 951 F.2d 1431, 1437 (3d Cir. 1991) (*citing Lesko v.Owens,* 881 F.2d 44 (3d Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990)); *see also Hakeem v. Beyer,* 990 F.2d 750 (3d Cir.1993) (explaining that the balancing of the *Barker* factors is a legal issue subject to "plenary review"). However, "the factual findings underpinning these legal conclusions are reviewed for clear error." *Burkett,* 951 F.2d at 1437 (*citing Monachelli v. Warden,* 884 F.2d 749 (3d Cir. 1989)). The same standard of review applies to the Appellate Division's review of a PCR court's determination.

*Analysis*

 Here, the PCR court and the Appellate Division each applied the four-part *Barker* test, however the courts reached opposite conclusions of whether a speedy trial violation occurred. The PCR court found that the thirty month delay between Petitioner's arrest and his trial date was presumptively prejudicial. *See Hakeem v. Beyer,* 990 F.2d 750 at 760 (3d Cir.1993) (holding that a fourteen month pretrial incarceration was presumptively prejudi-

cial). The PCR court attributed the delay to the court's and the OPD's failure to provide Petitioner with adequate assistance. The court explained that this delay should be weighted against the state even if it was for neutral, and not intentional reasons—"The fact that the Prosecutor may have had no part in this does not diminish that the defendant has certain sixth amendment constitutional rights. When the courts and/or the [OPD] drops the ball, that still affects the defendant's rights." (PCR Tr. at 97).

Further, the PCR court found that Petitioner asserted his right to a speedy trial. He was constantly complaining that he was not getting representation and "kept on continually crying out that he needed counsel and needed help."[5] (PCR Tr. at 97).

With regard to the final prejudice factor, the court emphasized the impairment on Defendant's ability to establish a defense. The court focused on the following facts: (1) this was a capital case requiring early preparation of a defense and adequate representation by counsel; (2) both the court and the prosecutor were aware that the OPD had withdrawn; (3) the court and the OPD suggested the incorrect appellate procedure regarding the withdrawal of representation and (4) Defendant was unable to rectify the situation because he was confined to his cell for 23 hours per day, had no counsel, little or no access to a law library, and no information about how to correctly appeal. The court also found that there were additional delays even after Petitioner was assigned counsel. As example, Counsel was unable to efficiently determine trial strategy or trial witnesses because of the courts delay of 14 months in

---

**5.** According to the court docket, petitioner wrote to Judge Falcone on at least six separate occasions, and to the OPD on at least 3 occasions, between the time the OPD withdrew representation and March 31, 1989, a period of approximately 13 months, to complain about the lack of representation and his difficulty in appealing the OPD's decision.

deciding Defendant's pre-trial motions. (PCR Tr. at 95–96.)

Finally, the PCR court found that Defendant was prejudiced by the death of a potential witnesses, Irving Gaskins, in September 1989. According to a certificate prepared in connection with an investigative interview with Gaskins on July 6, 1989, Gaskins stated that he "did not see Mr. Douglas with any weapons." (PCR. Tr. at 98). Because one of the key pieces of evidence in the case was testimony from officers that the gun was found on Defendant's person at the time of his arrest, Gaskins testimony may have weakened the State's case. The PCR court explained:

> [T]he Court cannot know whether or not Mr. Gaskins would have held up under cross-examination. But since this became the critical issue, the fact that this case was delayed so long and Mr. Gaskins, who was ill and everyone knew he was ill from the time the defendant was arrested died in September of '89 … Why the public defender didn't take his deposition or do something, the Court doesn't know. The Court doesn't even know whether the state would have consented to having the deposition taken of the matters.

(PCR Tr. at 99).

In contrast, the Appellate Division applied the four-part *Barker* test and found that based on the evidence developed by the PCR court, Defendant was not denied his right to a speedy trial. First, the Appellate Division found that since capital cases in New Jersey are usually not tried for two years according to a governor's study, the three year delay in this capital prosecution did not by itself give rise to prejudice or a speedy trial violation. *See State v. Douglas,* 322 N.J.Super. 156, 171, 730 A.2d 451, 461 (N.J.Super.Ct.App.Div.1999) (*citing State v. Long,* 119 N.J. 439, 469, 575 A.2d 435 (N.J.1990))

(holding that 971 day delay did not violate petitioner's right to a speedy trial since the delay was attributable to the defendant, the pre-trial time was productively used, and it was necessary for defendant to prepare a list of mitigating factors.), *cert. denied* 162 N.J. 197, 743 A.2d 849 (1999).

Second, the Appellate Division found that the PCR court placed too much weight on the OPD's withdrawal and Petitioner's difficulty appealing that decision. The court recognized that "no matter the reason for delay, 'the ultimate responsibility' for bringing the case to trial 'must rest with the government.'" *Id.* (*quoting Barker,* 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). However, because the reason for delay here was not a deliberate attempt to hamper the defense, it should not be weighed so heavily against the government. *See id.* at 172, 730 A.2d 451. Although the Appellate Division acknowledges that the OPD and the trial court may have misapplied the new Public Defender statute, N.J.S.A. 2A:158A–151, in determining Defendant's indigence, it found that any such error could not be viewed as a "deliberate attempt to hamper the defense." *Id.*

With respect to the third factor, the Appellate Division emphasized the fact that Petitioner did not assert his right to a speedy trial until a motion for a specific trial date was made on February 22, 1990. That motion was essentially to ensure there was time to arrange for the Tuckers, two defense witnesses, to return from Australia. *See id.* The Appellate Division also relied on defense counsel's suggestion during his testimony that Petitioner "would have been prejudiced by a likely unsuccessful motion to dismiss on speedy trial grounds because of what would have had to have been revealed in terms of contemplated trial strategy." *Id.* Further, the Appellate Division noted that the reason a mo-

tion for speedy trial was probably not made earlier was to give the defense counsel time to prepare the mitigating factors because if found guilty defendant must serve them immediately upon entry of the verdict. *Id.* at 171, 730 A.2d 451.

Finally, the Appellate Division did not find sufficient evidence in the record to suggest that Defendant was unduly prejudiced by the delay in the appointment of counsel. "Such proceedings would have, of necessity by virtue of the needs of the defense team in a capital case, carried beyond the death of Irving Gaskins or any other event which defendant points to as the basis for his claim of prejudice." *Id.* at 173, 730 A.2d 451. Although the motion for a new trial referred to Gaskins' death and possible prejudice if a trial date was not granted, the motion was not filed until about five months after Gaskins' death. *See id.* at 172, 730 A.2d 451. The court further noted that there was never an attempt to take Gaskins' testimony despite the statement he made during the investigative interview about Defendant not possessing a gun. The court determined that any prejudice concerning Gaskins' death would be speculative because it was not possible to determine whether Gaskins' testimony would have been persuasive after cross-examination. *See id.* at 174, 730 A.2d 451.

The Appellate Division ultimately concluded that in light of the compelling evidence against Defendant (i.e. Broadway's identification, the officers' testimony about the handgun being found on Petitioner, and the discovery of the holster in his apartment):

> Gaskins' death (coming as it did after the Public Defenders' interview without an endeavor to preserve his testimony, the nature of Gaskins' statement regarding what he did not see without a fuller explanation of what he did observe, and

the giving of the statement long before a motion was made to fix a trial date) does not warrant the granting of post-conviction relief on the grounds that defendant was prejudiced by virtue of the pretrial delay.

*Id.* at 175, 730 A.2d 451.

This Court will not consider how it would have applied the *Barker* test because habeas relief is only available where the state court's application is "objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 1521, 146 L.Ed.2d 389, 428 (2000). As such, this Court "may not grant a writ of habeas corpus merely because it concludes in its independent judgement that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Gattis v. Snyder,* 278 F.3d 222 (3d Cir.2002)(*citing Jermyn v. Horn,* 266 F.3d 257, 281–82 (3d Cir.2001)). Under the standard articulated in *Williams,* this Court is constrained to deny Petitioner relief on this ground because the Appellate Division's decision did not involve an unreasonable application of clearly established federal law or an unreasonable interpretation of facts.

## II. *Appellate Division's Decision To Reinstate Petitioner's Indictment Was Not Erroneous*

Petitioner asserts that the Appellate Division applied an incorrect standard of review, misapplied the balancing test in *Barker v. Wingo* and erred in not ruling on the alternate grounds for dismissal. (Ground Twenty-three). As discussed, this Court finds that the Appellate Division properly balanced the factors outlined in *Barker* and applied the correct standard of review. The Appellate Division accepted the PCR court's factual findings and then reviewed the court's legal conclusion that Petitioner establish a speedy trial violation

*de novo. See Burkett v. Fulcomer,* 951 F.2d 1431, 1437 (3d Cir.1991) (*citing Lesko v.Owens,* 881 F.2d 44 (3d Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990)).

Petitioner also alleges that the Appellate Division erred in not ruling on his cross-appeal which asserted that he was entitled to post-conviction relief on the following grounds: (1) a violation of his right to counsel because of a statement he made to an officer without representation and (2) his arrest warrant was issued without probable cause. *See State v. Douglas,* 322 N.J.Super. 156, 730 A.2d 451 (N.J.Super.Ct.App.Div.1999), *cert. denied* 162 N.J. 197, 743 A.2d 849 (N.J.1999). The Appellate Division did not err in not deciding the cross-appeal because the issues were not properly before the court. The suppression issue involving the arrest warrant was already decided by the Appellate Division on direct appeal (N.J.Super. Ct.App. Div. Op.1995 at 20) and the issue involving the unrepresented statement should have been raised by Petitioner on direct appeal. Further, the Appellate Division noted that Defendant's attorney did not file a brief on this cross-appeal because he did not want to further delay the litigation. As such, this cross-appeal was not properly before the Appellate Division.

### III. *Warrantless Search And Seizure Was Constitutional Under The "Exigent Circumstances" Exception*

Petitioner claims that Hon. Joseph A. Falcone's rulings to deny his pre-trial suppression motions and admit the photograph and Broadway's identification [6] was an abuse of discretion. (Ground Seven). He further asserts that the search warrant

was defective because it was obtained by "reckless disregard of truth and material misrepresentation of fact." (Ground Seven).

### Standard For Fourth Amendment Violations

Under *Katz v. United States,* the basic constitutional rule is that searches conducted outside the judicial process (i.e. without approval by a judge or magistrate) are *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576. One such exception is for "exigent circumstances." *See McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). To establish this exception, the movant must demonstrate that the "exigencies of the situation made the search imperative." *Id.* As the Supreme Court explained, "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden Maryland Penitentiary v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967) (finding that warrantless search for suspects and weapons was reasonable where delay posed great danger). "Consequently, rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Illinois v. McArthur,* 531 U.S. 326, 331, 121 S.Ct. 946, 950, 148 L.Ed.2d 838 (2001).

### Analysis

■ The Appellate Division, in accor-

---

**6.** This Court considers the admission of Broadway's identification in Section 6C of

this opinion.

dance with the trial court,[7] found that "exigent circumstances" and probable cause justified the warrantless search and seizure of the photograph. (N.J.Super. Ct. App. Div. Op.1995, at 17) (*citing State v. Hutchins,* 116 N.J. 457, 473–76, 561 A.2d 1142 (1989)). As stated by the Appellate Division:

> There certainly was urgency involved, brought on by the presence of two dead women in apartment 2E next door to defendant's apartment and the fact that no murder weapon had been discovered by police in that apartment. That meant that an armed murder suspect, reportedly named "Skeet" who lived in apartment 2D, was still at large and possibly in apartment 2D. Moreover, insofar as the subsequent seizure of the photograph for identification purposes is concerned, it is important to consider that Broadway was seriously injured and the police thought that she could die soon. Thus there was an immediate need to have Broadway verify her earlier identification of her assailant. Finally, when the three officers first entered apartment 2D, there was a possibility that there were people in that apartment who may have been shot and might need immediate medical assistance to prevent their deaths. In light of these circumstances, there was an urgent need for police to enter apartment 2D immediately without first procuring a warrant.

(N.J.Super. Ct.App. Div. Op.1995, at 17–18).

The court also points out that there was probable cause to enter Defendant's apartment resulting from Broadway's report of a shooting and the discovery by the officers of the Moores' bodies in apartment 2D. The combination of exigent circumstances and probable cause justified the initial search and therefore the search warrant was based on properly seized evidence.

■■■ Finally, the Appellate Division found that the search warrant was not defective because Petitioner failed to demonstrate that the officers deliberately or recklessly omitted information from his application. *See State v. Stelzner,* 257 N.J.Super. 219, 235, 608 A.2d 386 (N.J.Super.Ct.App.Div.1992). "To succeed in challenging a [search] warrant's supporting affidavit, defendants must allege deliberate falsehood or reckless disregard for the truth and must support such allegations by reliable proof sufficient to establish material falsity by a preponderance of evidence." *Id.* (*citing Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682 (1978)).

Here Defendant contends that the officer's affidavit was deficient because it did not indicate that Defendant's apartment had already been searched, a photograph had been seized, and that drugs, but no weapon had been discovered. The trial judge found, and the Appellate Court agreed, that Defendant failed to carry his threshold burden of proving deliberate falsehood or recklessness. Further, the evidence which was omitted was not material and would probably not have altered the judge's decision to issue the warrant. (N.J.Super. Ct.App. Div. Op.1995, at 19); *State v. Sheehan,* 217 N.J.Super. 20, 25–26, 524 A.2d 1265 (N.J.Super.Ct.App.Div.1987).

---

**7.** At Defendant's motion for a new trial Judge Alvin Weiss refused to set aside the pre-trial rulings finding that the initial search and the seizure of the photograph was justified under the exigent circumstances exception to the warrant requirement. The court also ruled that the search warrant was valid and the evidence seized pursuant to that warrant would not be suppressed

This Court finds that the Appellate Division's determination of the facts and application of clearly established federal law was reasonable, and denies relief on this ground.

## IV. *Petitioner's Arrest Was Not Unconstitutional*

Petitioner claims that his indictment should be dismissed because his arrest was improper. (Ground 18). He asserts that there was no probable cause for the issuance of his arrest warrant because it was based on an identification of a photograph that was unconstitutionally seized and a witness identification from someone who had never seen the alleged perpetrator of the crime.

In effect, Petitioner is advancing a "fruits" of the poisonous tree argument, whereby the arrest warrant is tainted by the illegality of the identification and the seizure of the photograph. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963). However, something cannot be the "fruit of the poisonous tree" if the tree itself is not poisonous. *See Colorado v. Spring*, 479 U.S. 564, 565, 107 S.Ct. 851, 852, 93 L.Ed.2d 954 (1987) (considering legality of confession). This court has already determined that the tree—the identification and the photograph—are not poisonous. As such, this Court finds, as the Appellate Division found, that this claim is "clearly without merit." [8] As such, this Court finds that the Appellate Division's decision did not involve an unreasonable application of clearly established federal law or an unreasonable application of facts.

**8.** It should be noted that the Appellate Division summarily decided this claim was meritless as permitted by R.2:11–3(e)(2): "When in an appeal in a criminal ... matter, the Appellate Division determines that some or all of the issues raised are clearly without merit, the court may affirm by an opinion, which as to those issues, specifies them and quotes this rule and paragraph."

## V. *Petitioner Was Adequately Represented By Counsel*

### A. Petitioner Was Not Unconstitutionally Denied Counsel After His Indictment

Petitioner alleges he was denied the benefit of counsel after his indictment for a period of about 9 months—from January 21, 1988, until October 12, 1988 in violation of his Constitutional right to assistance of counsel. (Ground One). Petitioner asserts that the OPD assigned him representation in August 1987, which was withdrawn on January 21, 1988. On October 12, 1988, Judge Falcone determined Petitioner indigent and eligible for representation by the OPD.

*Standard for Determining Eligibility For Representation*

The Sixth Amendment provides that an accused in a criminal prosecution has a right to the assistance of counsel. As such, if a defendant is financially unable to retain counsel a trial court must appoint counsel to represent him. *See Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Criminal Justice Act of 1964, 18 U.S.C. § 3006A, implemented the constitutional right to counsel: "[T]he United States magistrate or the court, if satisfied after appropriate inquiry that the defendant is financially unable to obtain counsel, shall appoint counsel to represent him." 18 U.S.C § 3006A(b). This Act does not provide for a particular method for ascertaining a defendant's financial status. Rather, the Act merely requires an "appropriate inquiry." 18 U.S.C. § 3006A.

■ The Third Circuit has explained that the defendant bears the initial burden of establishing his financial eligibility for the appointment of counsel. *See United States v. Gravatt,* 868 F.2d 585 (3d Cir.1989)(*citing United States v. Anderson,* 567 F.2d 839, 840 (8th Cir. 1977); *United States v. Ellsworth,* 547 F.2d 1096, 1098 (9th Cir.1976), *cert denied,* 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 247 (1977)). Once a defendant puts the court on notice of his inability to retain private counsel, the district court must, " 'make further inquiry into the defendant's financial condition to ascertain whether he is entitled to have counsel appointed to represent him.' " *Id.* (*quoting United States v. Martin–Trigona,* 684 F.2d 485, 490 (7th Cir.1982)).

*Analysis*

■ Here Defendant was not unconstitutionally deprived counsel for nine months after his indictment because the OPD made a reasonable investigation into his financial condition before withdrawing representation. The OPD based its determination of Defendant's financial status on the fact that Defendant owned a home which, according to their investigation with local brokers, had a market value of between $70,000 and $110,000, depending on its condition. *See State v. Douglas,* 322 N.J.Super. 156, 730 A.2d 451 (N.J.Super.Ct.App.Div.1999), *cert. denied* 162 N.J. 197, 743 A.2d 849 (N.J.1999). Further, the OPD discovered that Defendant was expecting a recovery in a then pending civil litigation. *See id.* At the time of the OPD's determination, on January 21, 1988, Defendant had not informed the OPD that his home was worthless and he would only receive $3,500 from the insurance proceeds. The OPD did not discover this information until August 26, 1988 when a criminal case manager questioned Defendant as to his financial status. Defen-

dant's financial status was ultimately considered by the court and Defendant was appointed counsel on October 12, 1988.

This Court recognizes that Petitioner had difficulty appealing the OPD's decision because he was misdirected by the OPD and the trial court. Further, in April, 1988 N.J.S.A. 2A:158S–15.1 became effective and authorized courts to make indigence determinations, rather than the OPD. Despite this legislative change, the trial court did not determine Petitioner's indigence and eligibility for representation until October 12, 1988.

The PCR court held that the Public Defender's withdrawal did not constitute a sufficient basis for reversal. (PCR Tr. 58). This Court finds that the PCR court's determination did not involve an unreasonable application of clearly established federal law nor an unreasonable application of the facts.

## B. Petitioner Was Not Constructively Denied Counsel

Petitioner asserts that he was constructively denied counsel throughout preliminary investigation, trial and appellate stages of this case due to a conflict of interest present when different public defenders were appointed to represent him in November 1988 after the initial Public Defenders had withdrawn from his representation in January 1988. (Ground Two).

*Standard for Public Defenders' Conflict of Interest*

■ In *State v. Bell,* the New Jersey Supreme Court held that, in claims involving public defenders, courts must review the record to determine whether there is an actual conflict of interest and whether actual prejudice will arise from the representation. 90 N.J. 163, 168–9, 447 A.2d 525 (N.J.1982). Claims involving successive representation from the same

OPD must be reviewed on a case-by-case basis to determine whether there are sufficient facts to make a determination as to whether or not there was an actual conflict of interest. *See People v. Banks,* 121 Ill.2d 36, 117 Ill.Dec. 266, 520 N.E.2d 617 (Ill.1987).

The Supreme Court of New Jersey explained that there is less potential for a conflict of interest between associates at the OPD than between associates in a private practice because the OPD does not possess the same financial incentive as private firms. *See State v. Land,* 73 N.J. 24, 372 A.2d 297 (N.J.1977)(holding that in private practice "in the absence of a waiver, if a potential conflict of interest exists, prejudice will be presumed resulting in a violation of the New Jersey constitutional provisions guaranteeing the assistance of counsel.")

*Analysis*

■ The PCR court found that "the testimony at the proceedings by Mr. Kapin, the only one of the two public defenders assigned to represent him in October or November 1988, was that he found no problem in representing defendant merely because his office had previously represented him and then terminated his representation." (PCR Tr. at 51). The PCR court "did not find that either of the public defenders assigned to represent the defendant held back in vigorously defending the defendant. There's been no evidence presented to this Court from which [this court] could make a determination that there was a conflict of interest which resulted in prejudice to the defendant." (PCR Tr. at 53).

After carefully reviewing the record, this Court agrees that Petitioner has not provided sufficient evidence of an actual conflict of interest. As such, this Court does not find that the PCR court's determination involved an unreasonable application of clearly established federal law or an unreasonable determination of the facts and denies relief on this ground.

## C. Petitioner Was Not Denied Effective Assistance of Counsel

Petitioner contends that his trial counsel was ineffective because he did not sufficiently investigate, prepare, or present a meaningful defense. (Ground Four). Furthermore, Petitioner asserts that he was denied effective assistance of counsel on direct appeal because despite his request, counsel did not file interlocutory appeals for ineffective assistance of counsel, identification, or speedy trial claims. (Ground Five).

*Standard For Ineffective Assistance of Counsel*

■ Under the test set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) in order to prove ineffective assistance of counsel:

First the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064; *see also Berryman v. Morton,* 100 F.3d 1089, 1094 (3d Cir.1996). "Only after both prongs of the analysis have been met will the petitioner have asserted a successful ineffective assistance of counsel claim. Moreover, 'judicial scrutiny of an attorney's competence is highly deferential.'" *United States v. Hart,* Civ.A. No. 00–5204, 2002 WL 318337, *4 (E.D.Pa.

Feb. 25, 2002) (*quoting Diggs v. Owens,* 833 F.2d 439, 444–45 (3d. Cir.1987)).

A deficient performance is one that falls "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. To establish deficient performance, petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. In making an objective evaluation as to counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065; *Hart,* 2002 WL 318337 at *4 ("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial.").

■ To prove prejudice, petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2056. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Under *Strickland,* petitioner is required to demonstrate how specific errors undermined the reliability of the guilt-determination process. *See United States v. Cronic,* 466 U.S. 648, 659 n. 26, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984). Absent some effect of defense counsel's conduct on the trial process' reliability, the Sixth Amendment guarantee is generally not implicated. *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

*Analysis*

■ The PCR court held a full evidentiary hearing on the issue of ineffective assistance of counsel, and found Petition-er's claim without merit. First, the PCR court determined that the public defenders who tried this case "vigorously pursued the examination and cross-examination of witnesses produced by the State. They made or attempted to make a strong showing that the testimony of the police was unreliable and unbelievable and that the testimony of [Broadway] was based on her mistaken beliefs." (PCR Tr. at 57). After closely examining the record, this Court agrees that the Public Defender's trial performance was not deficient. Because Petitioner has not demonstrated that his counsel's trial representation was deficient, he does not meet the first prong of the *Strickland* test and it is unnecessary to consider the prejudice prong.

■ Further, Petitioner contends that there was ineffective assistance of counsel because defense counsel failed to file interlocutory appeals for issues raised by the Petitioner, such as his right to a speedy trial. The PCR court found this claim to be without merit. After considering counsel's testimony on this issue, the court concluded that the decision of whether to file interlocutory appeals requires a judgement call on the part of the counsel and the court should not substitute its judgement for that of defense counsel. Further, the court explained that even if defense counsel had filed an interlocutory appeal, the Appellate Division may not have granted the motion. The Appellate Division rarely grants motions for leave to appeal before the jury renders its verdict. As such the PCR Court found, and this Court agrees that counsel's representation was not deficient in this respect.

■ Petitioner also contends that he was denied effective assistance of counsel because of the public defender's failure to conduct an extensive investigation. The PCR court recognized that the public de-

fender's representation may have been deficient because a thorough investigation was not immediately conducted despite the gravity of the charges against the defendant. (PCR Tr. at 59). The PCR court found, however, that even if the representation was deficient, the ineffective assistance claim would still fail because Petitioner has not demonstrated that any deficiency resulted in prejudice to the Defendant's case. (PCR Tr. at 59). This Court agrees with the PCR court's determination. This case was not complicated and was largely based on circumstantial evidence (i.e. Broadway's voice identification and the police testimony that the Defendant was in possession of the murder weapon when he was arrested the next morning.). The jury had the opportunity to consider the testimony and arguments and make a determination on the defendant's guilt. Under these circumstances, it does not appear that an earlier investigation would have changed the outcome of the case. As such, this Court finds that Petitioner fails to meet the *Strickland* test in this respect and finds that the PCR court's application of federal law and interpretation of the facts was reasonable

■ Finally, Petitioner contends that he was denied effective assistance of counsel on direct appeal due to the failure of counsel to fulfill constitutional standards of advocacy in the appellate brief. Petitioner submits that counsel did not raise the speedy trial claim and did not adequately address the denial of counsel and ineffective assistance of counsel claims to the Appellate Division. The OPD's alleged failure to advocate on behalf of the Petitioner may be sufficient to prove that counsel was deficient. However, even if this Court finds that Counsel's representation was deficient, it would nonetheless deny Petitioner's ineffective assistance claim because he has not demonstrated

prejudice. The Appellate Division considered each of the claims—speedy trial, denial of counsel and ineffective assistance of counsel—and determined that the "contentions can not be heard on direct appeal because the appellate record lacks the transcript and other information for us to decide the issues ..." (N.J.Super. Ct. App. Div. Op.1995 at 26). As such, Petitioner has not met the *Strickland* test because any alleged deficiency on appeal did not effect the outcome of the case—the Appellate Division would have nonetheless required the record to be developed.

This Court finds that the PCR court's decision did not involve an unreasonable application of clearly established federal precedent or an unreasonable application of the facts in light of the evidence and therefore denies relief on this ground.

## VI. *Petitioner Was Not Denied A Fair Trial*

### A. There Has Not Been Any Prosecutorial Misconduct

Petitioner alleges that the Prosecutor engaged in acts of misconduct during the grand jury proceedings and at trial that deprived him of a fair trial and an impartial verdict. (Ground Six). Essentially, Petitioner asserts that the prosecutor allowed Broadway to testify falsely during the suppression hearing and at trial, and that the Prosecutor deceived the jury during voir dire and summation.

*Standard For Prosecutorial Misconduct*

■ Under *Chapman v. California,* the standard used for determining whether the prosecutorial misconduct violated a constitutional right is whether, beyond a reasonable doubt, the prosecutor's comments contributed to petitioners' convictions. 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Furthermore, a habeas corpus challenge to alleged prosecutori-

al excess in summation is not cognizable unless the remarks so infected the trial that the Petitioner was deprived of due process. *See Romano v. Oklahoma,* 512 U.S. 1, 12, 114 S.Ct. 2004, 2012, 129 L.Ed.2d 1 (1994); *see also Todaro v. Fulcomer,* 944 F.2d 1079, 1082 (3d Cir.1991).

*Analysis*

The Appellate Division summarily found that this claim was without merit as permitted by R.2:11–3(e)(2). (N.J.Super. Ct. App. Div. Op.1995 at 24–25). At the hearing for postconviction relief, the court refrained from considering this ground because it was available for presentation to the Appellate Division on direct appeal and not appropriate for post-conviction relief. (PCR Tr. at 49). The PCR Court noted however that it "has reviewed the materials submitted by the Petitioner in connection with those two grounds and does not find that there was any prosecutorial misconduct." (PCR Tr. at 49). After carefully reviewing the record, this Court finds that the Appellate Division's decision did not involve an unreasonable application of federal law or an unreasonable interpretation of the facts.

**B. Trial Judge Did Not Abuse His Discretion In Admitting Evidence**

Petitioner contends that the trial judge abused his discretion in allowing an in-court identification by Broadway, identification testimony of Broadway, and the admission of hearsay. (Ground Eight). The only supporting fact he alleges in this claim is that "[t]here never was any identification, voice or otherwise, at any time of the alleged perpetrator or perpetrators who entered the bedroom and professedly committed the crime." (Ground Eight). ▮ The habeas corpus statute and rules require the petitioner to plead specific facts supporting each claim for relief.

*See James D. Liebman and Randy Hertz, Federal Habeas Corpus Practice and Procedure,* at 509–12. The petitioner must include in the statement of each claim enough supporting facts to justify relief if the alleged facts are proven. *See Hill v. Lockhart,* 474 U.S. 52, 61–62, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (finding facts insufficient to support a finding of prejudice). This Court finds that Petitioner did not assert facts sufficient to support a finding that the trial judge abused his discretion in admitting Broadway's testimony. Petitioner did not even identify the statement that he alleges is hearsay. Under such circumstances this Court finds that it cannot grant Petitioner's request for habeas relief on this ground.

Furthermore, even if Petitioner plead additional facts, this claim would probably be denied because it is without merit. Factual issues determined by a state court are presumed to be correct, and the Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *See Werts v. Vaughn,* 228 F.3d 178, 196 (3d Cir.2000) (*citing* 28 U.S.C. § 2254(e)(1)). As the Appellate Division noted, "this court should defer to the trial judge's 'feel of the case' where such matters as witness credibility and demeanor are concerned." (N.J.Super. Ct.App. Div. Op.1995 at 24) (*quoting Dolson v. Anastasia,* 55 N.J. 2, 6–7, 258 A.2d 706 (N.J. 1969)). Similarly, reviewing courts should defer to a trial court's evidentiary determinations except when an evidentiary ruling is "so inflammatory as to prevent a fair trial." *Duncan v. Henry,* 513 U.S. 364, 366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995). After reviewing the trial transcript, this Court finds that the trial judge did not abuse his discretion in permitting the in-court identification and did not violate the hearsay rule. (Trial Tr. Oct. 31, 1990).

## C. The Jury Instructions Were Not Erroneous

Petitioner asserts that he was denied a constitutional verdict by an unconstitutional jury charge that improperly bolstered the weight of circumstantial evidence, contained an improper instruction on reasonable doubt which lowered the threshold to return a conviction, and removed from the State the burden of proving every element of the offense. (Ground Nine).

*Standard for Improper Jury Instructions*

The standard for reviewing jury instructions is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' " *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (*quoting Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 319 (1990)). Claims of erroneous jury instructions do not generally form the basis for habeas relief. *See United States ex rel. Dorey v. New Jersey,* 560 F.2d 584, 587 (3d Cir.1977); *see also Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). Challenges to instructions are not cognizable on collateral review unless the disputed instruction " 'so infected the entire trial that the resulting conviction violates due process.' " *Polsky v. Patton,* 890 F.2d 647, 650 (3d Cir.1989) (*quoting Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). The burden of demonstrating that an erroneous instruction was so prejudicial that it supports a collateral attack is weightier than that necessary to establish plain error on direct appeal. *See Henderson,* 431 U.S. at 154–55, 97 S.Ct. at 1736–37; *Kontakis v. Beyer,* 19 F.3d 110, 114 (3d Cir.1994) (stating that federal courts are limited to deciding if a state conviction violates federal law).

*Analysis*

The Appellate Division considered and summarily rejected Petitioner's claim as permitted under R.2:11–3(e)(2) because the argument was "clearly without merit." (N.J.Super. Ct.App. Div. Op.1995 at 24–25). After reviewing the record, this Court finds that the jury charge was not erroneous. The judge properly outlined the elements of each offense and instructed the jury in each count that the state must satisfy its "burden of proof beyond a reasonable doubt." (Trial Tr. Nov. 7, 1990 at 133). The judge then defined reasonable doubt:

> A reasonable doubt is not a doubt based on a hunch or guess work or speculation. A reasonable doubt is not a mere possibility or imaginary doubt because everything relating to what people say or do is open to some possible or imaginary doubt. A reasonable doubt is an honest and reasonable uncertainty as to the guilt of Robert Douglas existing in your minds after, but only after you have given full and impartial consideration to all of the evidence. A reasonable doubt may arise from the evidence itself or from a lack of evidence. It's a doubt which a reasonable thinking person has after carefully weighing all of the evidence and testimony.

(Trial Tr., Nov. 7, 1990 at 168). Further, the judge properly explained to the jury the difference between direct and circumstantial evidence: "Direct evidence means evidence that directly proves a fact without an inference and which in itself if true conclusively establishes the fact. On the other hand, circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn." (Trial Tr., Nov. 7, 1990 at 164).

This Court agrees with the Appellate Division's decision and therefore does not find that its decision was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts.

### D. Trial Court's Decision Not to Declare a Mistrial Was Constitutional

■ Petitioner asserts that he was deprived of a fair, impartial and uncoerced verdict due to the trial court's decision not to declare a mistrial after the jury announced it could not reach an unanimous verdict. (Ground Ten).

■ The decision of whether to send a jury back for further deliberations is within the sound discretion of the trial court. *See State v. Pontery*, 19 N.J. 457, 117 A.2d 473 (1955). When a jury states that it cannot come to a unanimous verdict, it is appropriate but not necessary, for the judge to ask whether the jury desires more time to deliberate. *State v. Vergilio*, 261 N.J.Super. 648, 655, 619 A.2d 671 (N.J.Super.Ct.App.Div.), *cert. denied*, 133 N.J. 443, 627 A.2d 1147 (N.J.1993).

Here after slightly more than two and one half days of deliberations, on November 14, 1990 at 2:10 p.m. the jurors sent a note to the judge stating that they were not able to reach a unanimous verdict. Defense counsel immediately moved for a mistrial on the grounds that eleven of the twelve jurors had deliberated for more than twenty hours without making a determination. The judge denied Defendant's motion for a mistrial and instead instructed the jury, pursuant to the *Allen* charge, to continue deliberations without asking if they needed more time. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The jury returned a verdict on November 16, 1990 and convicted the Defendant on all counts.

The Appellate Division found that the judge's failure to inquire whether the jurors needed more time was "not critical ... in light of the fact that the judge immediately issued a comprehensive modified *Allen* charge that closely tracked the pertinent model jury instructions then in effect." (N.J.Super. Ct.App. Div. Op.1995 at 23). The judge specifically advised the jury that he was not permitted, nor did he wish to coerce a verdict from them. Rather, he instructed the jurors to decide the case individually and not to surrender their individual beliefs solely on the basis of the beliefs of other jurors. The judge further instructed the jurors to inform him if they are still unable to come to a unanimous conclusion.

The Appellate Division held that the trial judge did not err in instructing the jurors to continue deliberations instead of declaring a mistrial. This Court finds that the state court's determination was a reasonable interpretation of the facts and a reasonable application of clearly established federal law.

### E. Verdict Was Supported By Adequate Evidence

Petitioner alleges that he was convicted in a trial where the verdict was against the weight of the evidence in violation of the Fifth and Fourteenth Amendments. (Ground Eleven). Petitioner bases his argument on the problems with the testimony of the Medical Examiner, Broadway, and the police officers, as well as the lack of forensic evidence.

*Standard for Verdict Supported By Weight of Evidence*

■ A claim that the verdict is against the weight of the evidence is essentially a matter of state law, and does not raise a federal constitutional question unless the record is completely devoid of

evidentiary support in violation of Petitioner's due process. *See United States ex rel. Cunningham v. Maroney*, 397 F.2d 724, 725 (3d Cir.1968), *cert denied*, 393 U.S. 1045, 89 S.Ct. 663, 21 L.Ed.2d 594 (1969). Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt should a writ issue. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979); *Singer v. Court of Common Pleas, Bucks County*, 879 F.2d 1203, 1206 (3d Cir.1989). Factual issues determined by a state court are presumed to be correct, and the Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir.2000) (*citing* U.S.C. § 2254(e)(1)).

*Analysis*

■ Here the trial court denied Defendant's motion for a new trial because the jury verdict was supported by credible evidence. This decision was upheld by the Appellate Division which found that "[p]lainly, the evidence—if accepted as true by the jury—would support the guilty verdict against defendant." (N.J.Super. Ct.App. Div. Op.1995 at 24). This court finds that the Appellate Division's decision was a reasonable application of clearly established federal law and a reasonable application of the facts.

### F. Trial Was Fundamentally Fair

Petitioner asserts that his constitutional rights were violated because he was convicted by a trial that was fundamentally unfair. (Ground Twelve). In support of this argument, Petitioner relies on the facts he asserts in grounds One through Eleven.

The United States Supreme Court has not directly dealt with the issue of the cumulative effect of trial errors on the right to a fair trial. Lower federal courts are divided, with some developing the "cumulative error doctrine." Although the Third Circuit has not officially adopted the doctrine, it has stated in dicta that the cumulative effect of alleged errors may violate due process. *See United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir.1980). Also, at least one court in this district has recognized the cumulative error doctrine. *See Hutchins v. Hundley*, 1991 WL 167036 at *11 (D.N.J. Aug.22, 1991).

Assuming the cumulative effect doctrine is applicable, this Court finds that Petitioner has not demonstrated that there were minor trial errors which, when aggregated render his trial fundamentally unfair. The Appellate Division summarily dismissed this ground under R. 2:11–3(e)(2) finding that it was clearly without merit. (N.J.Super. Ct.App. Div. Op.1995 at 24–25). For the reasons discussed, this Court finds that Petitioner's trial was fair and his verdict was supported by sufficient evidence. As such, this Court finds that the Appellate Division's decision did not involve an unreasonable application of clearly established federal law or an unreasonable application of the facts.

### VII: Petitioner Was Not Denied A Direct Appeal

Petitioner asserts that he was denied an adequate and effective "as of right" direct appeal by the failure of the State to provide him with transcripts of proceedings related to his appeal. (Ground Fifteen). The PCR court has reviewed this claim and found that it is not an "issue anymore because the transcript has been provided and is now in the possession of the Court, the State and the defendant." (PCR Tr. at 49). This court agrees with the PCR court's decision that the issue is moot.

■ Petitioner further contends that he was denied an "as of right" direct ap-

peal because the Appellate Division utilized an erroneous legal standard in declining to rule on Petitioner's claims and not remanding the case. (Ground Sixteen). On direct appeal, Petitioner sought relief on grounds including denial of speedy trial, denial of counsel, ineffective assistance of counsel and conflict of interest of counsel. The Appellate Division declined to rule on these grounds finding that the "record on appeal is too undeveloped and incomplete to weigh properly defendant's constitutional arguments or to determine if he was prejudiced." (N.J.Super. Ct.App. Div. Op.1995, at 26) (*citing State v. Preciose*, 129 N.J. 451, 460–61, 609 A.2d 1280, 1285 (N.J.1992)). The Appellate Division ordered that the record for these claims be developed at a PCR hearing. The PCR court found that "the failure of the Appellate Court to order a remand did not constitute a violation of petitioner's constitutional right to direct appeal." (PCR Tr. at 47). This Court agrees with the PCR court and finds that the Appellate Division's decision was proper, and was not a denial of an "as of right" direct appeal.

## VIII. *Appellate Divisions' Opinion Was Not Erroneous*

Petitioner contends that he was denied his right to be heard at a meaningful time and in a meaningful manner by the state courts' failure to correct factual errors with regard to identification and claims of exigency. (Ground Fourteen). He further asserts that the Appellate Division attributed statements to Judge Weiss which he never stated. (Ground Fourteen). Petitioner requests that this Court correct these allegedly erroneous rulings. (Ground Seventeen).

This Court has already found in Ground Four that the trial court judge did not abuse his discretion in permitting the in-court identification. Similarly, this Court found in Ground Seven that the trial court did not err in finding that the warrantless police search was justified on the basis of exigency. As such, Petitioner has not demonstrated that there were any factual errors made by the trial court which should have corrected.

Furthermore, after reviewing the record, the PCR opinion and the Appellate Division's opinion, this Court finds that the Appellate Division's summary of the facts and proceedings was accurate. Further, this court rejects Petitioner's argument that it was erroneous for the Appellate Division to omit certain facts. The Appellate Division has the discretion to omit certain statements from its opinion so long as its summary is accurate.

 Moreover, even if the Appellate Division attributed a false statement to Judge Weiss or erroneously omitted a fact from its opinion, such error would be harmless. The Appellate Division based its decision primarily on its determination to distinguish the relative weight to be given to a " 'deliberate attempt to delay the trial in order to hamper the defense' and a more 'neutral' reason such as negligence or an overcrowded court system" and the prejudicial effect of the delay. *State v. Douglas*, 322 N.J.Super. 156, 171, 730 A.2d 451, 461 (N.J.Super.Ct.App.Div.1999) (*citing Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). The statements and omissions which Petitioner contests are unrelated to the court's finding that the delay was not deliberate and that the defendant was not prejudiced by any such delay. Rather, the statements were only made to provide background and to support the defense's view that remand would not be appropriate to explore the details regarding Gaskins' potential testimony, the potential witness who died before trial. *See id.* at 172, 730 A.2d 451. Therefore,

any misstatement or omission is at most harmless error and is not appropriate for habeas relief.

## IX. *Petitioner Was Not Deprived A Timely Appeal and Even Assuming He Was, Habeas Relief Is Not Available*

 Petitioner contends that the three year period between sentencing and the filing of the appellate brief by designated counsel violated his constitutional rights. (Ground Thirteen).

*Standard for Violation of Speedy Appeal Right*

 The Third Circuit instructs that the analysis for deciding a deprivation of a timely appeal is the same as that for a deprivation of a speedy trial. *See Burkett v. Fulcomer*, 951 F.2d 1431 (3d Cir.1991), *cert. denied*, 505 U.S. 1229, 112 S.Ct. 3055, 120 L.Ed.2d 921 (1992). "Under either constitutional amendment, we analyze whether after conducting the sensitive balancing test under *Barker v. Wingo*, the scales tip in favor of petitioner or the government." The four factors identified in *Barker* are: (1) length of delay; (2) reason for delay; (3) defendant's assertion of his right; and (4) whether defendant was prejudiced by the delay. *Barker*, 407 U.S. at 530–32, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 116–118. The Supreme Court explained that no single factor is dispositive and that these factors should "be treated as related factors to be considered with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533, 92 S.Ct. at 2190, 33 L.Ed.2d at 118.

 Although *Barker* is applied to both speedy trial and appeal violations, the Third Circuit has approved a district court's distinction "between personal prejudice in a pretrial context, the particular situation implicating the speedy trial clause factors for which the *Barker* factors were designed, and prejudice in a post-conviction context." *Heiser v. Ryan*, 15 F.3d 299, 305 (3d Cir.1994). One reason for the distinction is that "most of the traditional interests of the speedy trial guarantee is designed to protect 'diminish or disappear altogether once there has been a conviction.'" *Id.*, 15 F.3d at 305 (*quoting Burkett*, 951 F.2d at 1442). Another reason is that "the presumption of innocence, which underlies the societal concerns expressed in the Speedy Trial Clause, can no longer apply once the defendant has been found, or pleads, guilty." *Id.* As such, the Third Circuit instructed that "only unusual or specific problems of personal prejudice will satisfy the *Barker* test." *Id.* (*citing Government of the Virgin Islands v. Pemberton*, 813 F.2d 626, 629 (3d Cir.1987)); *cf. Burkett*, 951 F.2d at 1445–46 (finding prejudice because of the combination of "the continued inability to participate in rehabilitative programs, the anxiety of not knowing when his appeal would be decided and the further passing of time affecting his ability to reconstruct his defense.")

 In this case, Petitioner does not assert any prejudice not even personal prejudice in his petition. The only facts he provides in support of this claim is that "the time between sentencing and the filing of the appellate brief by designated counsel was approximately 3 years." (Pet. Br. at 36). The mere delay in appeal, without more, is not a sufficient basis for finding a constitutional due process violation.

Further, even if this court found that there was prejudice and that the delay of appeal was a violation of Petitioner's constitutional rights, this Court would be constrained to deny Petitioner relief pursuant to 28 U.S.C. § 2254. The Third Circuit has cited with approval the Second Cir-

cuit's approach with respect to the appropriate relief available when a post-conviction delay is found to be a violation of due process rights. *Heiser,* 15 F.3d at 306. In *Simmons v. Reynolds,* the Second Circuit denied a writ despite its finding of a speedy appeal violation because before the petition for habeas relief was decided, the appeal was decided and the conviction was affirmed. 898 F.2d 865 (2d Cir.1990). The Second Circuit explained:

> Release from custody is an extraordinary remedy, especially in a delay-of-appeal case where release would in effect nullify a state court conviction on grounds unrelated to the merits of the case. The usual disposition of a meritorious habeas petition based on a delayed appeal is to grant an alternative writ that orders the state either to prosecute the appeal within a specified reasonable period of time, or to release the petitioner.

*Id.* at 869. The Second Circuit found that release was not appropriate because "any prejudice [petitioner] may have suffered from the delay did not harm his ability to get a fair, albeit late, review of his conviction." *Id.*

■■■ Although the Third Circuit agrees with this approach, it has found that courts may fashion appropriate creative remedies besides immediate release from incarceration. As example, in *Burkett v. Fulcomer,* the Circuit found that the delays in sentencing and in resolving the appeals warranted a reduction of Petitioner's sentence by 39 months. 951 F.2d at 1431. However, the Third Circuit explained in a later opinion that the *Burkett* situation involved extreme circumstances because it was the longest pending criminal case and there was prejudice during

the pre-sentencing phase in violation of the Speedy Trial Clause. *Heiser,* 15 F.3d at 306. When extreme circumstances are not present, even if a due process violation is found, the writ of habeas corpus should not issue. *Id.* Rather, Petitioner's relief should be in a suit for damages under 42 U.S.C. § 1983. *Id. (citing Simmons,* 898 F.2d at 868).

For the reasons stated, this Court finds that Defendant has not been denied a speedy appeal and that even if he were denied this right, habeas relief would not be available as his appeal has already been decided and there are no extreme circumstances to justify an alternate remedy.[9]

## X. Petitioner May Not Bring A Claim For Habeas Relief Based On Deprivation Of Liberty

■■■ Petitioner asserts that he was deprived of his liberty when the Order dismissing his indictment was not executed upon expiration of the 20–day stay. (Ground Nineteen). He also contends that he was deprived of his liberty when the Appellate Division granted the State's motion to stay an already executed order, without a written opinion, after Petitioner was already released from custody. (Ground Twenty and Twenty-two). Petitioner further alleges that he was unconstitutionally reincarcerated without a hearing. (Ground Twenty-one).

This Court refrains from reaching the merits of Petitioner's deprivation of liberty claims because such claims are completely unrelated to Petitioner's conviction and are therefore not appropriate for habeas review. The Seventh Circuit has held that:

> Habeas corpus is not a compensatory remedy. The object is not to make

---

**9.** It should be noted that it would be difficult for this Court to grant a reduction in sentence even if there were extreme circumstances be-

cause Petitioner was sentenced to two concurrent life sentences with 30 year parole ineligibility, rather than to a fixed term of years.

whole someone who has suffered a loss; it is to determine whether someone is being confined in violation of basic norms of legality. It is conceivable that delay in processing an imprisoned defendant's appeal might make his continued imprisonment unlawful, but once the delay ends with an appellate decision not claimed to be invalid by reason of delay ... any ground for ordering him released evaporates.

*Allen v. Duckworth*, 6 F.3d 458, 460 (7th Cir.1993).

As discussed, this Court recognizes that the Third Circuit has taken a slightly different approach and held that courts may deny the writ and fashion alternative remedies to vindicate a Petitioner's rights in extraordinary circumstances. *Burkett*, 951 F.2d at 1445–46. However, in this case, even if the Court were to find a deprivation of liberty, it would not be able to fashion an appropriate remedy for such deprivation. This Court would not be able to grant the writ and order Petitioner's immediate release because his imprisonment is not illegal—the Superior Court, Appellate Division and this Court have already determined that Petitioner's indictment should not have been dismissed. Further, this Court finds that it should not grant a reduction of sentence even if such violation were found. Unlike the situation in *Burkett* where the petitioner was sentenced to a term of years, the Petitioner here was sentenced to life imprisonment with 30 year parole ineligibility.

For the reasons stated, this Court finds that Petitioner's claim does not state an adequate ground for habeas relief. As discussed, if Petitioner has been deprived of his liberty in violation of his constitutional rights his relief would be in a suit for damage under § 1983. *See Heiser*, 15 F.3d at 306.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. Because Petitioner has not made a substantial showing of the deprivation of a constitutional right as required by 28 U.S.C. § 2254, no certificate of appealability shall issue. Further, this Court denies Petitioner's request for emergent relief pending the determination of this motion as moot.

## ORDER

Petitioner, Robert E. Douglas moves for relief under 28 U.S.C. § 2254. For the reasons given in this opinion,

It is on this ____ day of August, 2002,

ORDERED that the Petition is DENIED; it is further

ORDERED that no certificate of appealability shall issue; and it is further

ORDERED that Petitioner's request for emergent relief is DENIED.